NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 251003-U

NO. 4-25-1003

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 15, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Logan County |
| KATHLEEN R. YATES, | ) | No. 21CF30 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jonathan C. Wright, |
| | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court
Presiding Justice Steigmann and Justice Doherty concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed defendant's sentence, finding the trial court did not err when it considered the (1) contemplation of harm, (2) need for deterrence, and (3) victim impact statements.

¶ 2    In May 2025, defendant, Kathleen R. Yates, pleaded guilty to involuntary manslaughter (720 ILCS 5/9-3(a) (West 2020)). On July 7, 2025, the trial court sentenced her to 5 years' imprisonment and 12 months of mandatory supervised release. Defendant subsequently filed an amended motion to reconsider the sentence, which the court denied.

¶ 3    Defendant appeals, arguing the trial court abused its discretion when it rejected a statutory mitigating factor and relied on improper aggravating factors at sentencing. We disagree and affirm.

¶ 4                                I. BACKGROUND

¶ 5    In January 2021, defendant was charged with three counts of first degree murder

(*id.* § 9-1(a)(1), (2)) for the death of her husband, John Yates. In February 2021, the State filed an amended information charging defendant with five counts of first degree murder (*id.* § 9-1(a)(1), (2), (3)), one count of armed violence (*id.* § 33A-2(c)), and one count of aggravated battery with a firearm (*id.* § 12-3.05(e)(1)). In May 2025, defendant was additionally charged with involuntary manslaughter (*id.* § 9-3(a)).

¶ 6 On May 6, 2025, defendant pleaded guilty to involuntary manslaughter in exchange for the dismissal of the remaining charges. The partially negotiated plea included no agreement as to defendant's sentence.

¶ 7 The trial court heard the following factual basis for defendant's plea. On the morning of January 19, 2021, defendant called 911 to report she had shot her husband. The paramedics responded, and John was pronounced dead at the scene. An autopsy confirmed John's cause of death was a gunshot wound to the chest. Defendant was taken into custody and interviewed by law enforcement. In the interview, defendant admitted she and John were arguing when she retrieved a handgun from the bedside table, pointed the gun at her head, and then pointed the gun at John. The firearm discharged and struck John in the chest. After admonishing defendant, the court accepted her plea, finding it was knowingly and voluntarily entered.

¶ 8 On July 7, 2025, the trial court conducted defendant's sentencing hearing. Prior to the sentencing hearing, defendant filed a sentencing memorandum arguing for a sentence of probation, asserting, *inter alia*,

> "she was not contemplating harming her husband or that using the gun as a prop to
> make an emphatic point during an argument would result in his death. [Citation.]
> She only contemplated that making her husband appreciate how upset she was by
> putting the gun to her head and then pointing it [at] him given his previous

- 2 -

statements that they should shoot themselves."

¶ 9        At the sentencing hearing, the trial court acknowledged receiving defendant's sentencing memorandum and presentence investigation report (PSI), noting 12 support letters and 2 victim impact statements were attached to the PSI. Defendant objected to the inclusion of the two victim impact statements from Kelly and Paul Deckard, as she believed they were prejudicial. The court ruled it would consider "only those portions that pertain to the impact of this offense upon their lives, as set forth by statute and also corroborated by *People v. Larson*[, 2022 IL App (3d) 190482]."

¶ 10        As supplements to the PSI, the trial court admitted three State exhibits, without objection: (1) defendant's firearm owner's identification (FOID) abstract, (2) defendant's concealed carry license abstract, and (3) a victim impact statement from David Petty, a close friend of John. The court admitted multiple defense exhibits without objection, including (1) a letter from defendant's therapist and (2) support letters from Rhonda and Lois Battin. Additionally, witness interviews taken by the defense's investigator were admitted under the stipulation the court would consider only those portions pertaining to defendant's character. Lastly, without objection, the court admitted several published articles discussing sympathetic responses and involuntary gun discharges, including (1) "Involuntary Firearms Discharge: Does the finger obey the brain?" from the Police1 website, (2) "The Risk of Involuntary Firearms Discharge" from Human Factors: The Journal of the Human Factors and Ergonomics Society, and (3) "Don't Call It a 'Negligent' Discharge" from Police Magazine.

¶ 11        The State then published defendant's 911 calls and police interviews from January 19, 2021, and presented testimony from lead investigator Matthew Comstock of the Lincoln Police Department. Comstock testified he knew John socially. John was 77 years old and in poor physical

- 3 -

health when he died. Comstock recalled the crime scene and noted John's body was found in the 10 feet by 10 feet kitchen located next to the bedroom. He found a FOID card in the nightstand drawer where defendant stated she had retrieved the firearm. Comstock confirmed "a lot of blood" was found in the kitchen. There was no visible blood on defendant's clothes or hands at the time of her arrest. Comstock described the test results for the firearm used in the incident as normal and consistent with factory specifications.

¶ 12    On cross-examination, Comstock testified it was common for John to modify some of his guns with lightening trigger pulls. This was consistent with the stipulated testimony of David Petty, who would state, if called, that he and John "on occasions [had] their firearms modified for an easier trigger pull." Test results for the firearm used in the incident were normal and consistent with factory specifications. The firearm contained one live round in the chamber and five additional rounds in the magazine. The location of John's body, the nightstand storage, the location of the gun, the dog left in the basement, and the single shot fired at John were all consistent with defendant's description of the events. There were no incriminating Internet searches, texts, threats, or statements found during the search of defendant's phone which would indicate she had an intent to kill John.

¶ 13    Following Comstock's testimony, defendant offered written expert opinions from David A. Lombardo, Dr. Tyson Cobb, and Kevin P. Mante. Lombardo, who noted the gun's light trigger pull. The opinions also stated the shooting was consistent with an involuntary discharge caused by physiological stress, adrenaline, and "sympathetic squeeze." Cobb stated defendant's shot was an involuntary, unintentional discharge, consistent with startled sympathetic nervous system reactions. Mante explained defendant likely had her finger on the trigger and discharged the weapon involuntarily through a combination of startle and sympathetic responses.

¶ 14	Defendant then presented testimony from Officer Robert Sherren of the Lincoln Police Department about the circumstances of defendant's arrest. Video from his dashboard camera showed defendant exiting her house upon the arrival of police. Officer Sherren stated he handcuffed defendant and left her with another officer while he entered the home. The officer confirmed he recognized the photographs of the kitchen, the body, and the gun's location.

¶ 15	Following Sherren's testimony, defendant presented the testimony of Jason Yates, defendant's son. Jason was adopted by John in the fifth grade. Jason described positive memories of John as a father who taught him about cars, boxing, and shooting. Jason explained John had a federal license to sell firearms and would talk about lightening the trigger pull. Jason moved out of his parents' house in early adulthood. According to Jason, defendant served as John's caretaker beginning at the time John's health was deteriorating over the course of "several back surgeries" in the late 1990s. Jason moved back to Lincoln, Illinois, in October 2020 to help defendant care for John. In late 2020, John's physical and emotional condition was regressing. John "had a hard time" and "really needed some help" with mobility, tasks, and avoidance of falls. According to Jason, John stated he did not want to go to a nursing home and said he "would rather shoot himself than go." Out of serious concern, Jason gathered all the guns from the home, unloaded them, placed them in travel cases, and arranged for a family friend to store them in a safe. When John noticed the firearms were missing, "he was really mad" and became fixated on having them returned. Within a few days, the firearms were returned to the house. John's mobility began to improve with physical therapy, allowing him to resume activities and use the bathroom by himself. On the morning of January 19, 2021, Jason received a phone call from defendant. She was "very distraught," explaining "the gun accidently went off," she thought John was dead, and she had called 911. A recorded statement from Jason admitted during the hearing confirmed this,

providing, "Mom says there was an accident. Gun went off. I think he's dead." Jason testified he considered himself a victim in the case, losing his father in a "horrible situation" and now trying to "pick the pieces up" for his grieving family. Jason indicated the last time he was with his parents, a few days before the shooting, everything between his parents seemed normal. Jason described defendant as his "biggest cheerleader" in life. He stated she "cares very deeply" about and gives "back to others" in the community. He believed she did not pose any further risk of violence to anyone, and he noted defendant "accepted responsibility for what happened."

¶ 16        In allocution, defendant expressed profound remorse for causing "so much pain to others" and wishing she could "go back" and change the events of that day. She expressed she "never intended to hurt anyone" and was "overwhelmed by trauma and pain." She asserted the moment "the gun went off," the life of "[her] partner, [her] friend, a father, and grandfather" was taken. Defendant stated she "always tried to live [her] life with compassion and care" and referred to living "through abuse and struggles with [posttraumatic stress disorder]." She maintained she was "not a violent person" but "made a terrible mistake" in her hopeless state. Defendant indicated she was in therapy, seeking healing for herself and those she hurt, and would spend the rest of her life making amends. Directly addressing John's family, defendant expressed she was very sorry, acknowledged her words would never be enough, and hoped for their forgiveness someday.

¶ 17        After hearing the parties' arguments, the trial court stated it had considered "the factual basis for the plea, the [PSI], and the attachments, the history, character, and attitude of [defendant], the evidence and arguments and the statement of allocution." The court then addressed mitigating and aggravating factors as follows:

    "As to mitigation, I have to start off on the [factor] that does not apply but it    was
    referenced by [defense counsel] in his argument of sentencing. The Court finds that

(A)2, that being that [defendant] did not contemplate that the criminal conduct would cause or threaten serious physical harm does not apply. Common sense says when you pick up a loaded gun, you contemplate the possibility of serious harm.

Now I will give the opposite, that the corollary aggravating factor, that the defendant's conduct caused or threatened serious harm does not apply, as well. That is inherent in the offense and the law says that cannot then be added as a double instance as an aggravating factor."

¶ 18    In further mitigation, the trial court found (1) defendant had no prior criminal history, (2) her criminal conduct was a result of circumstances unlikely to recur, (3) she was likely to comply with probation, and (4) her character and attitude indicated she was unlikely to commit another crime. See 730 ILCS 5/5-5-3.1(a)(7), (8), (9), (10) (West 2024). The court referred to defendant's remorse and her cooperation with law enforcement, including her waiver of her *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), her truthful statement to police, her agreement to multiple interviews, and her consent to gunshot residue testing.

¶ 19    In aggravation, the trial court found the offense was committed by defendant against a person who (1) was 60 years old and (2) had a physical disability. See *id.* § 5-5-3.2(a)(8), (9). The court found an additional aggravating factor was deterrence, and the court reasoned, though the trigger pull was involuntary, "there were a number of intentional acts" leading up to the shooting, including reengaging in arguments, retrieving a loaded gun, and pointing it at John when defendant could have walked away. The court also weighed the "impact of the loss" on victims Kelly and Paul Deckard and David Petty, as noted in their victim impact statements.

¶ 20    The trial court sentenced defendant to five years' imprisonment, noting probation would be inconsistent with justice and deprecate the seriousness of the offense. Defendant filed a

- 7 -

motion to reconsider her sentence, followed by two amended motions and an Illinois Supreme Court Rule 604(d) (eff. Apr. 15, 2024) certificate. The second amended motion argued, *inter alia*, the court "erred in rejecting the mitigating factor that Defendant did not contemplate causing harm" to John and improperly relied on "the aggravating factor of deterrence." The court denied defendant's second amended motion.

¶ 21　　　　This appeal followed.

¶ 22　　　　　　　　　　　　　　II. ANALYSIS

¶ 23　　　　On appeal, defendant argues the trial court abused its discretion by (1) refusing to apply a statutory factor in mitigation, specifically, that she did not contemplate harm; (2) applying deterrence in aggravation; and (3) improperly relying on victim impact statements.

¶ 24　　　　A trial court's sentence must be based on "the particular circumstances of the case, including (1) the defendant's history, character, and rehabilitative potential; (2) the seriousness of the offense; (3) the need to protect society; and (4) the need for punishment and deterrence." *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 102. Additionally, sections 5-5-3.1 and 5-5-3.2 of the Unified Code of Corrections (Unified Code) (730 ILCS 5/5-5-3.1, 5-5-3.2 (West 2020)) set forth the mitigating and aggravating factors the court must consider when determining an appropriate sentence. See *Sturgeon*, 2019 IL App (4th) 170035, ¶ 105. However, "[t]he weight to be given to any proper factor *** is left to the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion." (Emphasis omitted.) *Id.* ¶ 104. "A trial court's sentence is an abuse of discretion only if it is greatly at odds with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense." *People v. Klein*, 2022 IL App (4th) 200599, ¶ 38. Moreover, "[a] sentence imposed within the statutory range provided by the legislature is presumed to be proper." *Sturgeon*, 2019 IL App (4th) 170035, ¶ 104. "In considering

the propriety of a sentence, the reviewing court must proceed with great caution and must not substitute its judgment for that of the trial court merely because it would have weighed the factors differently." *People v. Fern*, 189 Ill. 2d 48, 53 (1999).

¶ 25        Based on her guilty plea to involuntary manslaughter, defendant was subject to a sentencing range of 3 to 14 years' imprisonment. See 720 ILCS 5/9-3(f) (West 2020). The trial court imposed a sentence of five years, only two years more than the minimum.

¶ 26                            A. Contemplation of Harm

¶ 27        Defendant contends the trial court should have weighed as an additional statutory factor in mitigation that she did not contemplate her criminal conduct would cause or threaten serious physical harm. See 730 ILCS 5/5-5-3.1(a)(2) (West 2020). "[I]t is presumed a trial court considered all relevant mitigating and aggravating factors in fashioning a sentence, and that presumption will not be overcome absent explicit evidence from the record that the trial court failed to consider mitigating factors." *People v. Halerewicz*, 2013 IL App (4th) 120388, ¶ 43. The court does not need to recite and assign a value to each factor it considers. *People v. Pina*, 2019 IL App (4th) 170614, ¶ 19. Moreover, "[a] defendant's rehabilitative potential and other mitigating factors are not entitled to greater weight than the seriousness of the offense." *People v. Pippen*, 324 Ill. App. 3d 649, 652 (2001).

¶ 28        Here, the trial court expressly rejected defendant's argument that she did not contemplate her conduct would cause harm. While not required to explain its reasoning, the court stated, "Common sense says when you pick up a loaded gun, you contemplate the possibility of serious harm." Defendant argues the court relied "on a categorical proposition rather than the mitigating evidence presented." We disagree. It is apparent the court was commenting on the circumstances of this specific case, where defendant picked up a loaded gun during an argument

with John and eventually pointed it at him. Moreover, defendant specifically raised the argument about harm and using the gun as a prop to emphasize a point in an argument in her sentencing memorandum.

¶ 29    Citing *People v. Markiewicz*, 246 Ill. App. 3d 31, 55-56 (1993), defendant argues a trial court may not refuse to consider evidence in mitigation. *Markiewicz* is distinguishable. The sentencing court in *Markiewicz* stated it was " 'not going to consider any' " statutory factors in mitigation. *Id.* at 53. Here, nothing in the record suggests the court refused to consider "any" mitigating factors. See *id.* Rather, the court expressly considered and weighed the factors in mitigation, including whether defendant contemplated her conduct would cause harm. As to that factor, the court determined it did not weigh in defendant's favor. By arguing the court should have weighed this factor in her favor, defendant is essentially asking this court to reweigh the factors and substitute our judgment for the judgment of the trial court, which we cannot and will not do. See *People v. Alexander*, 239 Ill. 2d 205, 214-15 (2010).

¶ 30                                B. Deterrence

¶ 31    Section 5-5-3.2(a)(7) of the Unified Code (730 ILCS 5/5-5-3.2(a)(7) (West 2020)) provides that, in aggravation, in assessing the length of a prison sentence, a trial court may consider whether a "sentence is necessary to deter others from committing the same crime." Defendant argues when the trial court weighed deterrence as an aggravating factor, the court relied "on conduct beyond the elements of involuntary manslaughter" and "outside the scope of the conviction." Defendant suggests the court should not have considered deterrence as an aggravating factor because involuntary manslaughter involves a killing which is "unintentional" (see 720 ILCS 5/9-3(a) (West 2020)), and conduct which is unintentional cannot be deterred. We disagree.

¶ 32    The finding defendant committed involuntary manslaughter, *i.e.*, she did not intend

to kill John, includes the determination she acted recklessly; that is, she "consciously disregard[ed] the substantial and unjustifiable risk" inherent in pointing the gun at John and pulling the trigger, which is a "gross deviation from the standard of care *** a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2020); see *People v. Murray*, 231 Ill. App. 3d 1047, 1051 (1992). Such "recklessness" presupposes the misconduct was engaged in "consciously," and thus, it is susceptible to being deterred through a sentence of imprisonment. *Murray*, 231 Ill. App. 3d at 1051. Accordingly, by deterring such "recklessness," the commission of involuntary manslaughter is deterred as well. *Id.* at 1051-52.

¶ 33　　　Citing *People v. Martin*, 119 Ill. 2d 453, 459 (1988), defendant argues involuntary manslaughter cannot be deterred. In *Martin*, the defendant worked in a massage parlor and obeyed her manager's instruction to retrieve a shotgun when a fight broke out between the manager and inebriated customers. *Id.* at 455-56. While it was "not clear" as to whether the defendant pulled the trigger, the shotgun discharged and killed one of the customers. *Id.* at 456. It was in this context our supreme court noted the deterrence factor had "at best, marginal applicability to the circumstances surrounding the offense." *Id.* at 459. The *Martin* court reversed and remanded for resentencing because the trial court improperly applied the victim's death as a factor in aggravation. *Id.* at 463. In doing so, the *Martin* court did not establish a bright-line rule deterrence may not be considered for involuntary manslaughter.

¶ 34　　　As this court has noted, "deterrence may be a relevant consideration where a defendant makes conscious choices that cause harm to another person, even if the defendant did not intend such harm." *People v. Glover*, 2023 IL App (4th) 220681-U, ¶ 49. At the hearing on defendant's motion to reconsider her sentence, the trial court stated deterrence was not the only aggravating factor present and emphasized deterrence for reckless conduct engaged in consciously

was a proper factor for it to consider. See *Murray*, 231 Ill. App. 3d at 1051-52. Nothing about this was improper. *Id.*

¶ 35                                  C. Victim Impact Statements

¶ 36        Lastly, defendant argues the trial court abused its discretion by improperly considering the victim impact statements of Kelly and Paul Deckard. Defendant acknowledges her trial counsel failed to preserve this issue in her postsentencing motion. Defendant nonetheless asserts this court should review her claim under the plain-error doctrine. Under the rule, this court may disregard a defendant's forfeiture when a clear or obvious error occurred and "(1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). Defendant argues the evidence was closely balanced. The first step in a plain-error analysis is to determine whether any error occurred at all. *People v. Walker*, 232 Ill. 2d 113, 124 (2009).

¶ 37        We conclude there was no error. At sentencing, defendant objected to the inclusion of the victim impact statements as prejudicial, describing the statements as "rambling, railing, writing [*sic*], trying to vilify the defendant, [and] trying to call upon [the trial court] for a specific sentence." The State responded it was not seeking to introduce the statements "as aggravation in any way." It explained it was "not asking for aggravation" but "a way for the victims to be heard." The court agreed with the State, asserting:

> "The Court is going to consider the victim impact statements of Kelly Deckard and Paul Deckard. And only those portions that pertain to the impact of this offense upon their lives, as set forth by statute and also corroborated by [*Larson*]."

¶ 38        Defendant argues the victim impact statements included "extensive character

- 12 -

testimony, community status evidence, and comparative worth arguments." Defendant points to "allegations of abuse, financial manipulation, and premeditation" contained in the statements. However, the trial court ruled it would consider "only those portions that pertain to the impact of the offense" upon the victims' lives. Nothing in the record suggests the court improperly used the victim impact statements beyond this purpose.

¶ 39     In pronouncing sentence, the trial court referred to "the impact of the loss" on Kelly and Paul Deckard. The court acknowledged Kelly's statement "she never had the opportunity to say goodbye to her father." We cannot conclude this use of victim impact statements by the court was inappropriate. See *Larson*, 2022 IL App (3d) 190482, ¶ 37 ("To that final point, the purpose of the statute is to ensure that the sentencing judge will be informed of the full impact of the offense—be it the pain and loss suffered by a grieving family or the myriad ways in which a still-living victim has been and continues to be affected by the offense—so that that information may be factored into the sentencing calculus.").

¶ 40                          III. CONCLUSION

¶ 41     For the reasons stated, we affirm the trial court's judgment.

¶ 42     Affirmed.